FILED
2008 Jan-28 PM 03:12
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHWESTERN DIVISION**

ANNETTE G. CRANE,

PLAINTIFF,

VS. CASE NO.: CV-07-J-719-NW

MICHAEL J. ASTRUE,
Commissioner of Social Security,

DEFENDANT.

**MEMORANDUM OPINION**

This matter is before the court on the record and the briefs of the parties. This Court has jurisdiction pursuant to 42 U.S.C. § 405. The plaintiff is seeking reversal or remand of a final decision of the Commissioner of Social Security. All administrative remedies have been exhausted.

**Procedural Background**

The plaintiff applied for disability insurance benefits due to fibromyalgia, osteoporosis, back trouble and diabetes, causing the plaintiff to suffer from fatigue and pain (R. 106-107). The initial application was denied (R.18-24) and the plaintiff requested a hearing in front of an administrative law judge (ALJ),which was subsequently held on July 17, 2006 (R. 227). The ALJ thereafter found that the plaintiff was not under a disability at any time through the date of the decision (R. 8-

16). The plaintiff's request for administrative review of the ALJ's decision by the Appeals Council was denied on February 15, 2007 (R. 2-4). The ALJ's decision thus became the final order of the Commissioner of Social Security. *See* 42 U.S.C.§ 405(g). This action for judicial review of the agency action followed (doc. 1). The plaintiff argues that the ALJ's finding that she can engage in light work is not based on substantial evidence, and that the ALJ's determination that the plaintiff can return to her past work is not based on substantial evidence (doc. 16).[1]

The court has considered the record and the briefs of the parties. For the reasons set forth herein, the decision of the Commissioner is **REVERSED** and this case is **REMANDED** to the Commissioner for further action consistent with this opinion.

[1]The plaintiff argues that the ALJ's determination that "Ms. Fitts" can return to her past work as a "garment inspector" is not based on substantial evidence. Plaintiff's brief, at 24. There is no evidence either that the plaintiff has ever been called "Ms. Fitts," has ever been a garment inspector, or that the ALJ found that she had. The court assumes this was a typographical error on the part of the plaintiff. Similarly, the plaintiff's brief, under the heading "Statement of Issues," contains the following:

3. THE APPEALS COUNCIL

Plaintiff's brief, at 1.

While the court can sympathize with the plaintiff's frustration with the Appeals Council, the plaintiff makes no argument as to any action by the Appeals Council in this case, and in fact lists her argument that the ALJ was in error to determine she could return to her past work as a garment inspector as her third argument in the brief.

## Factual Background

The plaintiff was born on November 2, 1948, graduated high school and is certified as a nurse aide (R. 229). She worked as a nurse aide for 34 years (R. 229). The plaintiff also worked as a ward clerk in a nursing home for six months but could neither sit for the amount of time required nor handle the stress of that job (R. 237, 243-244). The plaintiff's past work as a nurse aide is classified as medium and semiskilled (R. 245). The plaintiff's work as a ward clerk is classified as light and semiskilled (R. 246). The Vocational Expert (VE) noted that such work was "of a relatively short duration, which may or may not be considered vocationally relevant" (R. 246). Work as a nurse aide has no transferrable skills to light or sedentary work, while work as a ward clerk would have transferable skills to other light work only, such as a general office clerk, but none to sedentary work (R. 246).

The plaintiff testified she tried to work part-time because when she was working full-time she would "come home from work and I couldn't do nothing. I'd just lay on the couch and hurt all night. Some nights I couldn't sleep" (R. 230). She believed she could no longer perform her job properly (R. 234). When she tried to work part-time, other employees helped her lifting patients because she did not have the strength to do so (R. 230-231). She stated she was "just wore out" (R. 233). She hurt and could not sleep, getting only three hours of sleep a night (R. 233-234). The

plaintiff further stated that the walking at her job caused her problems and that she would do thirty minutes worth of work, then sit in a patient's room for ten minutes resting before continuing with her duties (R. 235).

The plaintiff has pain across her shoulders, down the backs of her legs, in her left hip and in the small of her back (R. 231). An orthopedic specialist told her that she "had osteoporosis real bad and with the fibromyalgia, they were working against each other" (R. 231). The plaintiff also suffers from diabetes which is worsened by stress (R. 231). The plaintiff further stated that if she does too much one day, she spends the whole next day on the couch because of pain (R. 232). She also testified that she had to put her husband in a nursing home because she was no longer able to care for him (R. 232). She has pain every day (R. 235). The plaintiff rated her pain as a seven most days but sometimes worse (R. 241). At home, she will do a little bit and then go lie down (R. 236, 239).

The plaintiff also stated that she has leg pain at night that keeps her from sleeping and makes her get up and walk around (R. 242). Sometimes she can sleep and sometimes it keeps her awake all night (R. 242). She testified that she could lift a gallon of milk with one hand, but if it was full she would have to use two hands (R. 239). She can stand for ten or twenty minutes before her legs "go numb" (R. 240).

Her doctor told her not to lift more than ten pounds (R. 240). The plaintiff relies on her daughter or grandson to go with her grocery shopping (R. 238).

The VE was asked to assume a person who could perform medium work, lifting fifty pounds occasionally and twenty-five pounds frequently, who could stand or walk six out of eight hours per day (R. 246-247). Given the question asked, the VE testified that the plaintiff could return to her past relevant employment (R. 247). The VE further testified that if the plaintiff's testimony regarding her limitations was taken as true, including the need to rest frequently and moderately severe pain, she would be precluded from all gainful employment (R. 248).

The medical evidence in the record is as follows: In March and April 2002 the plaintiff was seen by Dr. Grayton Tubbs for pain in her shoulders, neck and lower back (R. 129-139). Limited motion of her spine was noted (R. 131). Dr. Tubbs diagnosed the plaintiff with lumbosacral sprain, unchanged; sprain/strain neck, unchanged; and myalgia/myositis NOS, unchanged (R. 131, 135). He prescribed pain relievers and muscle relaxers (R. 131-132, 135, 139). In March, trigger points were noted in the plaintiff's back, although her neck had no significant limitation of motion (R. 135). Dr. Tubbs also noted that the plaintiff reported the pain kept her awake at night (R. 137). Dr. Tubbs referred the plaintiff for an MRI of her cervical spine, which was essentially normal (R. 140).

The plaintiff was seen in an emergency room in July 2003 for chest pain (R. 144). A cardiac catheterization found no coronary artery disease (R. 148).

Due to the plaintiff's ongoing back pain, she was sent for a CT of her thoracic spine in February 2005, which found some degenerative changes with osteophyte formation at T8 and T9, as well as a benign hemangioma (R. 153, 160). The plaintiff was also sent for an MRI because of back, right shoulder, hip and leg pain (R. 154). Minimal desiccation and disc space narrowing were noted, but it was considered an "[e]ssentially negative exam for the patient's age ..." (R. 155).

The plaintiff was referred to Dr. William Dunham, an orthopaedic surgeon, due to "quite severe pain in the middle of her back, some in her shoulders and arm, down in the back of her legs and into the bottom of her feet" (R. 160). He opined her symptoms were caused by a degenerative arthritic type of pattern to her back (R. 160). Dr. Dunham noted she had been previously diagnosed with fibromyalgia and was diabetic, and that prior steroid injections for pain aggravated her hyperglycemia (R. 160).

The plaintiff was also followed by Dr. Edward Fisher for back pain. The plaintiff reported to him in March 2005 that her back felt better since she had been off work (R. 163).

The plaintiff's regular treating physician is Dr. Victor D. Norman. His notes reflect that the plaintiff suffers from Type 2 diabetes, an overactive bladder (R. 176), and back pain (R. 177). His March 2005 notes reflect that the plaintiff quit work and was seeking disability (R. 177). Dr. Norman repeatedly noted the plaintiff's shoulder and lower back were tender, made worse by movement and eased by rest (R. 178-179, 190). She was noted to be in moderate distress (R. 190). In December 2004, Dr. Norman prescribed trigger point injections for ongoing back pain (R. 180-183). His records further reflect numerous reports of pain and diagnoses of fibromyalgia and diabetes (R. 183, 186, 188-191). Dr. Norman also stated that:

> Annetta L. Crane is my patient. She has multiple medical probelms including diabetes, fibromyalgia, overactive bladder, and lower back pain....
> The lower back pain has caused this patient to be incapacitated for working. The back pain in combination with the other medical problems noted above have made this patient totally and permanently disabled.

(R. 208).

The plaintiff was sent for a consultative examination in June 2005 (R. 196). Dr. S.D. Steele noted normal range of motion in all joints except the lower lumbar spine, both hips, and knees (R. 197). In those locations he noted pain on palpation and stiffness throughout the range of movement but no reduction in the range of movement (R. 197). Dr. Steele concluded that the plaintiff had "significant

symptomatology and likely has ailments of fibromyalgia and degenerative arthritis. She is likely unsuited to return to her former occupation ...." (R. 197). He did not state that the plaintiff was malingering or exaggerating her symptoms.

Dr. Norman's record from August 2005 states that the plaintiff has fibromyalgia and presented with low back pain (R. 223). Her lower back was tender with muscle spasms present (R. 223). In September, October and November 2005, Dr. Norman noted the plaintiff had low back pain, dull aches and sharp shooting pain, aggravated by movement (R. 215, 218, 221). He found muscle spasm present, tenderness over her spine and decreased range of movement (R. 216, 219, 221). A December 2005 record from Dr. Norman reflects the plaintiff's complaints of numbness in her left arm, pain in her neck with pain radiating to her left arm and left leg and numbness in both these extremities (R. 212). He noted recurrent numbness in the plaintiff's leg from lower back disease (R. 212). In January 2006, Dr. Norman noted the plaintiff had numbness in her left arm which was improving, and recurrent numbness in her leg from lower back disease with no change in that or in her backache (R. 209). He recorded that the plaintiff's movement of her neck was restricted, painful, and that there were muscle spasms present (R. 210). He diagnosed her as suffering from backache, cervical disc disease and lumbosacral disc

degeneration (R. 210). Dr. Norman also noted the plaintiff's prior diagnoses of diabetes, fibromyalgia and overactive bladder (R. 209).

The ALJ concluded that plaintiff suffered from the severe impairments of fibromyalgia, osteoporosis, degenerative disk disease of the lumbar spine, and diabetes but none of which meet or equal the requirements of any listed impairment (R. 10). The ALJ stated that he "noted the lack of ongoing significant objective clinical findings" (R. 11). Although the ALJ quoted the pain standard, he never applied it (R. 11).

Based on his evaluation of the evidence, the ALJ concluded that the plaintiff could perform light level work, that the plaintiff's past work as a ward clerk was light exertional work, and therefore the plaintiff could perform her past relevant work as a ward clerk (R. 15). On that basis, the ALJ ruled that the plaintiff was not under a disability at any time through the date of the decision (R. 16).

**Standard of Review**

In a Social Security case, the initial burden of establishing disability is on the claimant, who must prove that due to a mental or physical impairment she is unable to perform her previous work. *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir.1987). If the claimant is successful, the burden shifts to the Commissioner to prove that the claimant can perform some other type of work existing in the national economy. *Id.*

This court's review of the factual findings in disability cases is limited to determining whether the record contains substantial evidence to support the ALJ's findings and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420 (1971); *Wolfe v. Chater*, 86 F.3d 1072, 1076 (11th Cir.1996); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir.1990). "Substantial evidence" is generally defined as "such relevant evidence as a reasonable mind would accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206 (1938)); *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir.1996); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir.1983). This court must be satisfied that the decision of the Commissioner is grounded in the proper application of the appropriate legal standards. *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir.1988); *Bridges v. Bowen,* 815 F.2d 622, 624 (11th Cir.1987); *Davis v. Shalala*, 985 F.2d 528 (11th Cir.1993).

However, no such presumption of correctness applies to the Commissioner's conclusions of law, including the determination of the proper standard to be applied in reviewing claims. *Brown v. Sullivan*, 921 F.2d 1233, 1235 (11th Cir.1991); *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir.1991). The Commissioner's "failure to ... provide the reviewing court with sufficient reasoning for determining

that the proper legal analysis has been conducted mandates reversal." *Cornelius*, 936 F.2d at 1145-1146.

**Legal Analysis**

The ALJ determined the plaintiff retained the residual functioning capacity to perform the full range of light work. While the ALJ is correct that all of the plaintiff's objective medical testing has been normal, no doctor has stated that the plaintiff is exaggerating her pain. Nowhere does the ALJ state any evidence which disputes the diagnosis of fibromyalgia. In fact, the ALJ even accepts the diagnosis of fibromyalgia as a severe limitation. However, the ALJ then inaccurately portrays both the medical evidence in the record and the plaintiff's testimony.

Although the ALJ wrote that the plaintiff "testified that she buys groceries, albeit the bags are packed 'light' so that she can carry them" (R. 11), the plaintiff's testimony was actually as follows:

> Q. ... Do you have any difficulty shopping?
>
> A. Yes, I do.
>
> Q. Okay.
>
> A. Picking up –
>
> Q. Tell me about that.
>
> A. Sometimes I can bend over and pick up something, you know, on the shelves, sometimes I can't. Sometimes I have to take my

daughter with me or my grandson and they help me all – they help me bring in the groceries.

Q. Okay. How much do you think you could pick up? Could you pick up a grocery bag?

A. Yeah. If it's not too heavy.

Q. Okay. What would you consider --

A. If I got five or six cans in there, yeah, I could pick it up but if more than that, it's too heavy for me. And if I got flour and sugar and stuff, if they put them all in one bag, I can't pick up the whole bag.

(R. 238-239). The ALJ also decided that the plaintiff alleged that the job of ward clerk was too "stressful" (R. 15). What the plaintiff actually testified was that, "I couldn't do it because I had to sit too long or stand; you know, I'd have to get up and try to find something to do, stand up but that was in 2000 that I had that ward clerk job"[2] (R. 244). The plaintiff also testified that she had to take extra diabetes medicine and high blood pressure medicine when she had that job and that she removed herself from that job because "I was just too stressed out. I couldn't do it" (R. 244). When specifically asked if she could return to that type of work, the plaintiff stated, "No. Because I couldn't sit there at a desk all day" (R. 244).

[2]The plaintiff's medical records in evidence all post-date this time period.

The ALJ further misrepresents the plaintiff's testimony as to what she does on a typical day. The opinion of the ALJ states as follows:

> In response to questions regarding what she did on a normal day, the claimant testified that on Saturday, she watched TV until 3:00 and drove one hour to see her husband and, after visiting for 15 minutes, drove back home.

(R. 11). The plaintiff's testimony was actually as follows:

> Q. Okay. Ms. Crane, what's a normal day for you? What was Saturday like for you?
>
> A. Saturday? Let me think of what I did Saturday. Probably didn't do anything. I sat all day, watching TV until 3:00. I went to the nursing home to see my husband and I stayed there about 15 minutes and had to come home.
>
> Q. Okay. Now, how long do you think you could sit?
>
> A. Well, it took me an hour to get there and I was in pain by the time I got there.

(R. 237-238). In follow up, plaintiff's counsel asked her:

> Q. How long were you able to stay with your husband until you had to get back in the car and go home?
>
> A. I'd say about 20 minutes. I know it wasn't no more than that.
>
> Q. So you drove an hour, only stayed 20 minutes, and drove home?
>
> A. Uh-huh, yes.

Q. How did you feel and what was your condition when you got back to the house?

A. I just took a shower and went to bed.

Q. Why?

A. Because I was hurting.

(R. 244-245).

The reason the ALJ offered for discrediting plaintiff's testimony was because plaintiff could see to her own daily needs. Minimal daily activities do not render one capable of performing work. *See Lewis v. Callahan,* 125 F.3d 1436, 1441 (11th Cir.1997); *Venette v. Apfel,* 14 F.Supp.2d 1307, 1314 (S.D.Fla.1998).

The court further finds the record devoid of substantial evidence to support the ALJ's decision with regard to the medical evidence. No opinion regarding the plaintiff's physical abilities by a physician who has ever seen or treated the plaintiff appears in the record. Rather, there is only Dr. Norman's conclusory statement that the plaintiff is "totally and permanently disabled (R. 208) and Dr. Steele's opinion that the plaintiff was "unsuited to return to her former occupation...." (R. 197).

There are no medical residual functional capacity (RFC) determinations regarding the plaintiff's abilities or limitations caused by her various diagnoses, other than one completed by a disability specialist who has never seen or examined the plaintiff (R. 198-205). In other words, the record is devoid of any opinion by a doctor

who has ever seen the plaintiff as to her abilities and limitations. Nothing in the record supports the ALJ's conclusion that the plaintiff can perform a full range of light work. The ALJ determined that, based on his conclusion regarding the plaintiff's abilities, the plaintiff could return to work as a ward clerk, which the plaintiff testified she tried and could not do, and which the VE testified may not have been performed long enough to be vocationally relevant.

The court finds that the ALJ could only reach his conclusions by ignoring or substituting his judgment for the medical evidence contained in the record. For example, the ALJ states that the plaintiff has "not required any hospitalization, surgery, physical therapy, or epidural injections" (R. 15). The medical evidence reflects that the plaintiff received a trigger point injection in December 2004 (R. 180) and a Decadron injection in December 2005 (R. 213). A prior note from Dr. Dunham stated that the plaintiff had steroid injections because of discomfort, but they aggravated her hyperglycemia (R. 160).

Similarly, while the ALJ points out that the plaintiff did not return to Dr. Fisher, he is an orthopaedic surgeon to whom plaintiff was sent by Dr. Norman (R. 170). Dr. Fisher noted the plaintiff had a lot of trouble with fibromyalgia (R. 170). His letter to Dr. Norman makes clear that he was concerned about a "fracture or structural problem" (R. 170). The evidence established that the plaintiff did not

suffer from either of these. Additionally, the ALJ stated that Dr. Fisher's assessment was given "substantial weight ... as it is consistent with the objective medical evidence in the record" (R. 12). However, the assessment included, as stated above, that the plaintiff had a lot of trouble with fibromyalgia (R. 170), that the plaintiff felt better since she had been off work and that the plaintiff's pain recurred when she returned to work (R. 163).

In addition to finding Dr. Norman's opinion that the plaintiff was "incapacitated from working" to be entitled to no weight, the ALJ further ignored Dr. Norman's physical findings upon examination in January 2006. These included that the plaintiff had numbness in her left arm which was improving and recurrent numbness in her leg from lower back disease with no change in that or backache (R. 209). He recorded that the plaintiff's movement of her neck was restricted, painful, and that there were muscle spasms present (R. 210). He diagnosed her as suffering from backache, cervical disc disease and lumbosacral disc degeneration (R. 210). Dr. Norman also noted the plaintiff's prior diagnoses of diabetes, fibromyalgia and overactive bladder (R. 209). However, the ALJ summarized Dr. Norman's examination on this date as "essentially normal" (R. 13). Furthermore, although plaintiff's complaint of an overactive bladder is well-documented throughout Dr. Norman's records (R. 176, 177), the ALJ discounted this complaint because records

from Dr. Norman did not show treatment for or complaints of this problem (R. 13).

Similarly, while the ALJ discounts the plaintiff's pain because she has not been hospitalized, undergone surgery, or had physical therapy, none of the foregoing have been suggested as remedies for the plaintiff's pain. The fact that the plaintiff's treating physician chose not to pursue one type of treatment for her does not have any bearing on whether her subjective complaints of pain are credible. Additionally, no evidence is before this court that fibromyalgia responds to physical therapy or surgery better than other methods of treatment.

The ALJ also discounts the plaintiff's testimony that she had to rest during the day because it was "unsupported in the objective medical evidence" and because no doctor has suggested that she rest during the day (R. 13). However, Dr. Norman's records reflect the plaintiff reported her pain was exacerbated by movement and relieved by remaining still (R. 178-179, 190). This court finds that the records of the treating physicians and consultative physician in evidence support each other. No medical evidence contradicts these physicians' conclusions, and none of them opined that the plaintiff was malingering. Rather, they demonstrate that the plaintiff's treating physician referred her to specialists searching for treatment for her symptoms. The fact that no surgery was recommended by the specialists does not make the plaintiff's pain any less real, or the allegation that she needs to lie down during the

day any less credible. No medical evidence in the record refutes the plaintiff's allegations of pain and her continual need to rest because of pain.

Because the record is devoid of a RFC by a medical authority who has ever seen the plaintiff, and because the ALJ's findings contradict the medical evidence in the record, this case is due to be remanded for further evaluation of the plaintiff's functional physical capacity.

Upon remand, the plaintiff's physical ability and RFC should be evaluated by her treating physician or a consultative examination. Unless such examination establishes that the plaintiff is capable of medium level work or returning to past relevant light work, Rule 201.06, 20 C.F.R. Part 404, Subpart P, Appendix 2 requires a finding of "disabled."

**Conclusion**

Based on the foregoing, this case is **REVERSED** and **REMANDED** to the Commissioner for evaluation of plaintiff's physical ability and RFC by either her treating physician or by a consultative examiner.

**DONE** and **ORDERED** this the 28th day of January, 2008.

INGE PRYTZ JOHNSON
U.S. DISTRICT JUDGE